[Cite as *In re Estate of Alibrando v. Minor*, 2026-Ohio-133.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

IN THE MATTER OF: THE
ESTATE OF GUITO ALIBRANDO
MATTHEW ALIBRANDO, ET AL

        Appellants-Cross-Appellees

  -vs-

CONSTANCE MINOR

        Appellee, Cross-Appellant

Case No. 2025 CA 00051

Opinion And Judgment Entry

Appeal from the Licking County Court of Common Pleas, Probate Division, Case No. 2019-0068A

Judgment:   Affirmed in part; Reversed in part; Remanded

Date of Judgment Entry: January 15, 2026

**BEFORE:**  ANDREW J. KING, P.J., ROBERT G. MONTGOMERY, & KEVIN W. POPHAM, J.; Appellate Judges

**APPEARANCES:** Charles H. Bendig for Appellants/cross-appellees; C. Daniel Hayes, for-Appellee/cross-appellant

OPINION

*Popham, J.*

{¶1}    Appellants/cross-appellees Matthew and Vincent Alibrando appeal the judgment entries of the Licking County Court of Common Pleas, Probate Division. Appellee/cross-appellant Constance Miner also appeals the judgment entries of the Licking County Court of Common Pleas, Probate Division. For the reasons noted below, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

*Facts & Procedural History*

{¶2}   Miner and decedent Guito Alibrando were romantic partners from 1996 until his death in December 2018.  Guito had two sons, Matthew and Vincent Alibrando.  In August of 2013, Guito executed a last will and testament, designating Miner as the executrix of his estate and bequeathing her $100,000.  The will stated that the remainder of the estate would be split equally between Matthew and Vincent.

{¶3}   In November of 2013, Guito added Miner to a Chase Checking Account ("Joint Checking Account"), which was previously in his name only.  There is no dispute that this account is a joint account with right of survivorship[1].  There is also no dispute that the funds in this account were used exclusively for Guito's monthly expenses.

{¶4}   On August 25, 2015, Guito granted Miner durable power of attorney.  This document authorized Miner to sell any of Guito's real or personal property and to withdraw funds from any banking institution.  In July 2018, two years after Guito entered nursing care, Miner sold Guito's home using this power of attorney and deposited the sale proceeds into the Joint Checking Account.

{¶5}   Guito died on December 18, 2018.  Miner was notified by the nursing facility that day of his death, and she was subsequently appointed executrix of Guito's estate.  She filed a final account, which included:  $163,969.84 from Guito's Voya account, $144,125.75 from Guito's JPMorgan Annuity Account ("Annuity Account"), and $58,472.58 from Guito's life insurance proceeds.  According to Miner's final account, she

---

[1] We note that in November 2013 when Guito added Miner to the Joint Checking Account, had he intended to effectuate his estate plan as set forth in his will executed 3 months prior, rather than adding Miner to the joint and survivorship account, he could have simply executed a financial power of attorney providing for Miner's ability to transact from his individual checking account.

would receive $100,000, while Matthew and Vincent would each receive $132,327.14. Miner did not take any fiduciary fees.

{¶6} On July 11, 2019, Matthew and Vincent filed exceptions to the final accounting, claiming it failed to include proceeds from the sale of Guito's home. They also filed a complaint on August 30, 2019, alleging Miner concealed assets, and requesting her removal as executrix.

{¶7} Matthew and Vincent's original complaint alleged the following: Guito lacked the capacity to execute the 2013 will; the will was executed under Miner's undue influence; Guito lack the capacity to execute the 2015 power of attorney; the power of attorney was executed under Miner's undue influence; and Miner misused the power of attorney to make herself a co-owner of the Joint Checking Account, sell Guito's real estate, and deposit the proceeds from the real estate into the Joint Checking Account. Miner responded with an answer and counterclaim for frivolous conduct.

{¶8} Miner filed a motion for summary judgment, while Matthew and Vincent filed a partial motion for summary judgment. The trial court granted Miner's motion for summary judgment and denied the sons' motion. Matthew and Vincent appealed to this Court. In *Alibrando v. Miner*, 2021-Ohio-2827 (5th Dist.) ("*Alibrando I*") we reversed and remanded the case, finding the trial court erred in granting summary judgment to Miner because genuine issues of material fact existed regarding whether Miner, as a fiduciary, properly transferred the funds from the Joint Checking Account to her individual account for her sole benefit as opposed to the beneficiaries under the will.

{¶9} Additionally, we found the trial court erred in denying Matthew and Vincent's motion to amend their complaint.

{¶10} Following remand, Mathew and Vincent filed an amended complaint containing two claims: a claim for concealment pursuant to R.C. 2109.50, and a claim for constructive trust. The same three factual allegations form the basis of each claim: (1) Miner misused the power of attorney when she sold Guito's home in July of 2018; (2) Miner misused the power of attorney when she deposited the proceeds from the sale of Guito's home into the Joint Checking Account; and (3) Miner violated her fiduciary duties and misused the power of attorney when she transferred the funds from the Joint Checking Account into her personal account in 2019, after Guito's death. The amended complaint alleges Miner's conduct amounted to concealment pursuant to R.C. 2109.50, violated the Uniform Power of Attorney Act, or in the alternative, the circumstances resulted in a constructive trust in favor of Matthew and Vincent.

{¶11} On September 12, 2023, Matthew and Vincent disclosed Michael John Johrendt as an expert witness. The following day, Miner filed a motion to exclude this expert witness because he was disclosed after the expert witness disclosure deadline – August 15, 2023. On December 8, 2023, the trial court granted Miner's motion to exclude.

{¶12} On December 12, 2023, the trial court held a hearing on Matthew and Vincent's amended complaint during which the following testimony was adduced.

**Miner Testimony**

{¶13} Miner testified about the Joint Checking Account, which was originally established when Guito had a plumbing business. When Guito retired, his Social Security check went into the Joint Checking Account. Additionally, Guito had $1,000 per month from his Annuity Account transferred into the Joint Checking Account. Prior to Miner's addition on the Joint Checking Account, Miner would help Guito pay his bills each month;

however, Guito would sign the checks. Miner testified Guito never had any conversations with her about adding her name to the Joint Checking Account.

{¶14}   Miner never lived in Guito's home. After Guito entered nursing care and prior to selling Guito's home, Miner had to move approximately $5,000 per month from the Annuity Account to the Joint Checking Account to pay for Guito's monthly expenses, which included funds for the nursing facility, diapers, spousal support to Guito's ex-wife (Matthew and Vincent's mother), and all bills associated with Guito's home.

{¶15}   Miner decided to sell Guito's home in 2018 – at which point Guito had been in nursing care for two years. Miner believed that, due to Guito's condition, he was not going to be able to return home. The home had been empty for two years, things were falling apart, the gutters were stopped up, and the grass was not being cut. Also, Miner was having trouble obtaining insurance for the home because it was empty.

{¶16}   Upon deciding to sell, Miner asked both Matthew and Vincent if they wanted Guito's home; both declined. When Guito went into nursing care in 2016, Miner told both Matthew and Vincent they should come take anything they wanted out of the home. However, once she put the home up for sale in 2018, she gave them a one-week deadline to retrieve such items from the home.

{¶17}   Miner deposited the home sale proceeds into the Joint Checking Account. Miner testified that, in 2018 when she placed the money from the sale of Guito's home into the Joint Checking Account, she did not know the account was a joint and survivorship account, and she did not know the funds would go to her upon Guito's death. Miner stated the first time she found this out was when she went to an attorney's office after Guito's death. When asked what she thought would happen to the money in that

account, Miner testified she assumed the money would be spent for Guito's care and his monthly expenses, and she did not know where it would go after that. After the home was sold and the funds placed into the Joint Checking Account, Miner stopped moving $5,000 out of the Annuity Account each month. Rather, the money from the sale of the home was used to pay Guito's monthly bills and expenses.

{¶18} Miner also testified how she used the durable power of attorney, including to place Guito into nursing care, to sell his car, truck, and tractor, and to sell his home. She stated she understood her obligation to act in good faith, which meant "that I would do whatever is best for the party involved [Guito]." Miner stated neither Vincent nor Matthew ever objected to her use of the power of attorney, and, in fact, she used the power of attorney to transfer one of Guito's cars to Vincent's wife.

{¶19} Miner agreed that Guito's "estate plan" was to leave her $100,000 and leave the remainder to Matthew and Vincent but also testified that Guito wanted and needed to be taken care of during his lifetime - by using the money in his accounts for his nursing care and monthly expenses. Miner testified that the funds for the nursing home and monthly expenses, "had to come from somewhere."

{¶20} Initially when Guito was in nursing care, Miner visited him every day. After some time, she visited every other day. Prior to Guito's death, Miner testified that he had good days and bad days, and he recognized her until the day before he died. Miner heard nothing from the staff at the nursing facility that made her think Guito "was on death's door." Guito passed away because he aspirated on his food.

{¶21} Miner testified that on March 11, 2019 – after Guito's death - she transferred $207,487.90 from the Joint Checking Account to her personal savings account.

**Matthew Testimony**

{¶22} Matthew worked with Guito in the plumbing business before Guito retired. At some point, Matthew, Vincent, and Miner went together to look at nursing facilities for Guito. Matthew initially visited Guito at the nursing facility every weekend. However, Matthew did not see Guito for over two months before he died, because when Matthew went to visit, Guito was crying. When Matthew was asked who was looking out for Guito after he stopped visiting, Matthew testified, "I don't know. I wasn't going." He thought Miner "may have been looking out for him [Guito]." When asked about Miner's care of Guito near the end of Guito's life, Matthew responded, "I don't know, because the last end of his life, I didn't go." Prior to when Matthew stopped visiting, he "felt she [Miner] took care of my father." Additionally, prior to being placed in nursing care, Miner was Guito's primary caregiver, and Matthew felt she did a "fine" job with Guito's care.

{¶23} Matthew testified he did not know, prior to Guito's death, the contents of Guito's will, but his father told him he would be "taken care of." Matthew confirmed that Miner asked him if he wanted Guito's house before she put it up for sale and also that he informed Miner that he did not want it. When asked if he was aware the power of attorney gave Miner the authority to sell real estate and deposit funds into the Joint Checking Account, Matthew stated, "I'm not aware of anything."

{¶24} Matthew testified during deposition that Guito understood what his assets were in 2016. At the December 2023 hearing, Matthew testified Guito's memory "may have been questionable" prior to that date. However, Matthew stated that in 2014, when Guito conveyed real estate associated with the plumbing business to him via quit-claim

deed, Guito's memory was not questionable, Guito had the mental capacity to sign the deed, and Guito understood his actions.

{¶25} Matthew testified that while he originally thought Miner took Guito to an attorney's office, exerted undue influence upon Guito, and committed fraud in the inducement in making the new will, he has "no evidence" of undue influence or fraud and "we dropped that a long time ago" because "we don't have any evidence." Similarly, Matthew stated that while he originally thought Miner took Guito to the bank and fraudulently induced Guito to place her on the Joint Checking Account, he "had no evidence" of fraud. Further, Matthew testified that while his original complaint alleged Miner took Guito to an attorney's office in 2015 to obtain a new power of attorney via fraud and undue influence, he "had no evidence" Miner was present at the attorney's office when Guito executed the power of attorney and "did not have any evidence" that Miner had any involvement in the preparation of the power of attorney.

{¶26} When asked if he had any evidence Miner stole from Guito during Guito's lifetime, Matthew responded, "I do not." Additionally, Matthew was aware Miner was using the power of attorney to transact business on Guito's behalf, and he never objected to such use. When asked "when she [Miner] sold the real estate, are you alleging that action was a breach of her duties to your father," Matthew responded, "no." Counsel additionally asked, "when she [Miner] deposited funds into the joint account, was this a breach of her duties to your father," Matthew responded, "no." Matthew specifically testified that the only breach he alleges Miner committed was the breach that allegedly occurred after Guito's death, when Miner took the funds from the Joint Checking Account and placed them into an account solely in her name.

{¶27} When asked who he thought should be the executor to wrap-up Guito's estate, Matthew testified, "I don't know."

**Shook Testimony**

{¶28} Stephanie Shook ("Shook") is the attorney who prepared Guito's will and power of attorney. Shook had been Guito's neighbor for thirty years and knew Guito well. Shook testified that when Guito signed these documents, Miner was not present. Shook had no concerns about Guito's capacity to execute either document.

**Vincent Testimony**

{¶29} Vincent visited Guito approximately once or twice per year both prior to Guito being placed into the nursing facility, and after the placement. Vincent was asked by counsel, "at this time are we going forward with any allegations of misconduct by Connie other than the movement of the funds out of the checking account into her savings account," and he responded, "no." Vincent testified Miner used the power of attorney in 2016 to transfer Guito's car to Vincent's wife. Vincent had no issues with Miner's use of the power of attorney in that capacity.

**Procedural History**

{¶30} The trial court requested the parties file proposed findings of facts and conclusions of law, along with written closing arguments, which the parties each submitted. To be sure, the trial court did not issue a ruling for over one year. Thus, on December 17, 2024, Matthew and Vincent filed a request for status conference. The trial court did not rule on the request but, on June 16, 2025, issued its judgment entry on the December 12, 2023, hearing.

{¶31} The trial court found Miner not guilty of concealment pursuant to R.C. 2109.50, stating there was no evidence of efforts to hide Guito's funds. The trial court concluded Miner's mere possession of the funds did not constitute wrongful conduct.

{¶32} Next, the trial court found that the funds in the Joint Checking Account, apart from the proceeds from the sale of Guito's home, belong to Miner, because Guito's creation of a joint and survivorship account was conclusive evidence of Guito's intent to transfer the balance of the account to Miner upon his death.

{¶33} The trial court then determined Miner violated her fiduciary duties pursuant to R.C. 1337.34(A)(1), R.C. 1337.34(A)(3), and R.C. 1337.42(B) when she sold Guito's home and placed the proceeds from the sale into the Joint Checking Account. The trial court reasoned that, even if Miner's testimony that she had no knowledge of the survivorship nature of the bank account prior to Guito's death was credible, the deposit of proceeds from the sale of the home into the Joint Checking Account was a "gift," which was not permitted under the power of attorney document, and contradicted the clear intention of Guito, which was to leave Miner a "small amount" in the bank account and the $100,000 specifically bequeathed to her in the will.

{¶34} The trial court found that Miner had the authority to sell Guito's home pursuant to the power of attorney, and that her testimony "provided a good faith justification" for the sale of the home. Accordingly, due to this "good faith justification," Miner was not liable pursuant to R.C. 1337.34(A)(4). Despite this, the trial court found that by moving proceeds from the sale of the home into the Joint Checking Account and claiming those funds after Guito's death, Miner created an "interest in said proceeds that would not have existed otherwise, via her authority as a fiduciary," and this violated R.C.

1337.42(B). Further, the trial court found credible Miner's testimony that she acted in good faith at the time of the transaction; however, this did not protect her because Miner's actions defeated the expectations of Guito, went beyond the scope of her authority as Guito's agent, and were not in accordance with his estate plan. The trial court concluded the proceeds from the sale of Guito's home were property of the estate.

{¶35} The trial court additionally denied Matthew and Vincent's request for attorney fees and their request to remove Miner as executrix of Guito's estate.

{¶36} Miner appeals the judgment entry of the Licking County Court of Common Pleas, Probate Division, and assigns the following as error:

{¶37} "I. THE COURT ABUSED ITS DISCRETION IN FINDING DEFENDANT CONNIE MINER LIABLE TO PLAINTIFFS FOR VIOLATING R.C. 1337.34 AND R.C. 1337.42, AS THE PLAINTIFFS EXPLICITLY ABANDONED THEIR CLAIMS REGARDING CONNIE MINER'S CONDUCT AS DECEDENT GUITO ALIBRANDO'S POWER OF ATTORNEY, CONCEDED THAT HER CONDUCT PRIOR TO GUITO'S DEATH WAS APPROPRIATE, OR, ALTERNATIVELY, THE COURT'S FINDING THAT CONNIE MINER BREACHED HER DUTY AS POWER OF ATTORNEY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶38} Matthew and Vincent also appeal judgment entries of the Licking County Court of Common Pleas, Probate Division, and assign the following as error:

{¶39} "I. THE TRIAL COURT ERRED IN FAILING TO FOLLOW THE LAW OF THE CASE DOCTRINE AND EXPEDITIOUSLY ANSWER THE FOUR QUESTIONS POSED BY THE APPELLATE COURT ON REMAND AND IMPLEMENT THE MANDATORY REQUIREMENTS OF OHIO REVISED CODE 2109.50, ORDERING THE

PERSON HAVING THE POSSESSION OF MONEYS OF THE ESTATE TO PROMPTLY AND WITHOUT DELAY RETURN THE MONEYS TO THE ESTATE."

{¶40} "II. THE TRIAL COURT ERRED IN FAILING TO EXPEDITIOUSLY IMPLEMENT THE MANDATORY REQUIREMENTS OF OHIO REVISED CODE 2109.50, ORDERING THE PERSON HAVING THE POSSESSION OF MONEYS OF THE ESTATE TO PROMPTLY AND WITHOUT DELAY RETURN THOSE MONEYS TO THE ESTATE."

{¶41} "III. THE TRIAL COURT ERRED IN FAILING TO EXPEDITIOUSLY IMPLEMENT THE MANDATORY REQUIREMENTS OF OHIO REVISED CODE 2109.52, WHERE THE PERSON FOUND GUILTY IS THE FIDUCIARY, RENDERING JUDGMENT IN FAVOR OF THE NEW FIDUCIARY AGAINST THE REMOVED FIDUCIARY FOR THE AMOUNT OF THE MONEYS HELD IN POSSESSION, TOGETHER WITH PENALTY AND COSTS AS PROVIDED IN THIS SECTION."

{¶42} "IV. THE TRIAL COURT ERRED IN FAILING TO EXPEDITIOUSLY IMPLEMENT THE MANDATORY REQUIREMENTS OF OHIO REVISED CODE 2109.53, REMOVING THE FIDUCIARY, APPOINTING THE ALTERNATE FIDUCIARIES AS STATED IN THE WILL TO CONTINUE THE ADMINISTRATIVE PROCESS, ORDERING THE FIDUCIARY THAT IS REMOVED SHALL NOT RECEIVE COMPENSATION FOR ACTING AS FIDUCIARY AND SHALL BE CHARGED FOR THE AMOUNT OF THE JUDGMENT, FINDING THE FIDUCIARY'S PROPERTY LIABLE FOR THE SATISFACTION OF THE JUDGMENT ON EXECUTION ISSUED ON THE JUDGMENT BY THE FIDUCIARY'S SUCCESSOR."

{¶43} "V.   THE TRIAL COURT ERRED IN FAILING TO EXPEDITIOUSLY IMPLEMENT THE MANDATORY REQUIREMENTS OF OHIO REVISED CODE 2109.54, ENTERING JUDGMENT FOR THE NEW FIDUCIARY UNDER SECTION 2109.52 OF THE REVISED CODE, DELIVERING TO THE CLERK OF THE COURT OF COMMON PLEAS A CERTIFICATE OF THAT JUDGMENT IN ACCORDANCE WITH SECTION 2329.04 OF THE OHIO REVISED CODE, COMPLETE AND DELIVER THE CERTIFICATE TO THE FIDUCIARY ON DEMAND, WHERE THE CLERK WILL THEN ISSUE AN EXECUTION OF THE COURT OF COMMON PLEAS FOR THE AMOUNT OF THE JUDGMENT AND THE COSTS THAT HAVE ACCRUED OR THAT MAY ACCRUE ON THE JUDGMENT WHERE PROCEEDINGS ON EXECUTION SHALL BE THE SAME AS IF THE JUDGMENT HAD BEEN RENDERED IN THAT COURT OF COMMON PLEAS."

{¶44} "VI.   THE TRIAL COURT ERRED IN FAILING TO ORDER PRE-JUDGMENT INTEREST FROM FEBRUARY 19, 2019, FOR THE AMOUNT OF MONIES WITHHELD, $207,487.90."

{¶45} "VII.   THE TRIAL COURT ERRED IN EXCLUDING THE EXPERT WITNESS TESTIMONY OF MICHAEL JOHRENDT."

{¶46} "VIII. THE TRIAL COURT ERRED IN FAILING TO ORDER REASONABLE ATTORNEY FEES AND COSTS AS POINTED BY MICHAEL JOHRENDT IN THE AMOUNT OF $67,562.75, AND COSTS TO DATE IN THE AMOUNT OF $18,955.50."

{¶47} "IX. THE TRIAL COURT ERRED IN FAILING TO EXPEDITIOUSLY FIND MINER, AS A FIDUCIARY, IMPROPERLY TRANSFERRED THE FUNDS FROM THE JOINT CHECKING ACCOUNT TO HER INDIVIDUAL ACCOUNT FOR HER SOLE

BENEFIT AS OPPOSED TO THE BENEFICIARIES UNDER THE WILL; MINER'S ACTIONS WERE NOT IN GOOD FAITH; MINER FAILED TO ACT IN ACCORDANCE WITH GUITO'S REASONABLE EXPECTATIONS; MINER FAILED TO ATTEMPT TO PRESERVE GUITO'S ESTATE PLAN, WHICH WAS TO BEQUEATH HER $100,000 WITH THE REMAINDER TO APPELLANTS."

{¶48} "X.   THE TRIAL COURT ERRED IN FAILING TO ORDER JUDGMENT AND PRE-JUDGMENT INTEREST FROM FEBRUARY 19, 2019, FOR THE AMOUNT OF MONIES WITHHELD, $207,487.90, ATTORNEY FEES, AND COSTS."

{¶49} "XI.   THE TRIAL COURT ERRED IN FAILING TO REMOVE THE EXECUTOR, AND SUBSTITUTE THE ALTERNATE EXECUTORS NAMED IN THE DECEDENT'S WILL, DENYING THE REMOVED EXECUTOR FEES, DENYING THE REMOVED EXECUTOR ATTORNEY FEES."

*Miner's Assignment of Error I.*

{¶50}   In her sole assignment of error, Miner argues the trial court committed error in finding her liable to Matthew and Vincent for violating R.C. 1337.34 and R.C. 1337.42 because they abandoned their claims regarding her conduct as Guito's power of attorney and conceded that Miner's conduct prior to Guito's death was appropriate.   Alternatively, that the trial court's finding that Miner breached her duty as power of attorney was against the manifest weight of the evidence.   We agree with Miner on both arguments.

*Abandonment of Claims*

{¶51}   Matthew and Vincent's amended complaint included two claims: an action for concealment and a claim for constructive trust.   Three factual allegations supported each claim: (1) Miner misused the power of attorney when she sold Guito's home in 2018;

(2) Miner misused the power of attorney when she deposited the proceeds of the home sale into the Joint Checking Account; and (3) Miner misused the power of attorney when she transferred the funds from Guito's home sale from the Joint Checking Account to her personal account after Guito's death.

{¶52} The trial court found Miner's act of placing the proceeds from the sale of the home into the Joint Checking Account violated R.C. 1337.34 and R.C. 1337.42 and, because of this violation, the funds from the home sale are assets of Guito's estate.

{¶53} "The deliberate abandonment of any argument at trial precludes subsequently raising the abandoned claim for the first time on appeal." *Popovich v. Webster & Webster, L.L.P.*, 2014-Ohio-1825, ¶ 33 (8th Dist.); *Jones v. Billingham*, 105 Ohio App.3d 8 (2nd Dist. 1995) (parties abandoned claims). The testimony by both Matthew and Vincent at the December 2023 hearing clearly establishes that they both abandoned their claim [at trial] that Miner's action of placing the proceeds from the sale of the home into the Joint Checking Account violated the Uniform Power of Attorney Act and/or her fiduciary duty.

{¶54} Matthew testified as follows:

Q. Ms. Miner sold your father's real estate while he was alive, correct?

A. I think so.

Q. Okay. When she did that, are you alleging that action was a breach of her duties to your father?

A. No.

Q. Okay. When she deposited those funds into the account at Chase Bank that was jointly owned by herself and your father, do you feel that was a breach of her duties to your father?

A. No.

Q. Okay. So as you sit here today, the breach that you're alleging in your complaint is that she, after your father died, took money from that account and transferred it to a different account; is that correct?

A. That's correct. (T. at p. 130).

{¶55} Vincent testified:

Q. And so at – at this time are we going forward with any allegations of misconduct by Connie other than the movement of the funds out of the checking account into her savings account?

A. No.

(T. at p. 187).

{¶56} Because Matthew and Vincent abandoned [at trial] the theory that Miner misused the power of attorney when she deposited the proceeds of the home sale into the Joint Checking Account, the trial court could not have based its decision on this theory. Thus, the trial court abused its discretion in finding Miner violated R.C. 1337.34 and R.C. 1337.42 by placing the proceeds from the sale of Guito's home into the Joint Checking Account in 2018.

{¶57} Matthew and Vincent do not believe they abandoned this claim. They argue that this Court's *Alibrando I* decision prevented them from arguing this claim at trial. As discussed below, we find the law of the case doctrine inapplicable. Further, as detailed

above, Matthew, Vincent, and their counsel repeatedly and specifically stated they were not alleging Miner violated her fiduciary duty in her placement of the funds into the Joint Checking Account.

{¶58} Matthew and Vincent contend that, even if they abandoned the claim as to the deposit of the funds into the Joint Checking Account, the trial court's decision should be affirmed because Miner violated her fiduciary duty and/or the Uniform Power of Attorney Act by moving the funds from the Joint Checking Account to her personal account in 2019, after Guito's death. We disagree.

{¶59} Miner could not have violated either R.C. 1337.34 or R.C. 1337.42 several months after Guito's death because the power of attorney terminated upon Guito's death. R.C. 1337.30(A)(1) states, "a power of attorney terminates when … the principal dies." See also *Saber Health Care v. Ohio Dept. of Job & Family Servs.*, 2020-Ohio-4044, ¶ 32 (4th Dist.). Guito died on December 18, 2018. Miner became aware of his death on that date because the nursing facility immediately notified her of Guito's death. The power of attorney became invalid upon Guito's death on December 18, 2018. Equally as significant, upon Guito's death, the Joint Checking Account became the sole property of Miner.

{¶60} Questions surrounding reasonable expectations and whether Miner preserved Guito's estate plan are obligations imposed by the Uniform Power of Attorney Act. When Miner transferred the funds from the Joint Checking Account to her personal account, the power of attorney had expired. Miner cannot have violated her fiduciary duty under the power of attorney when the conduct Matthew and Vincent complain of was taken in her individual capacity and was carried out after the power of attorney terminated.

No assets were concealed or taken from the estate because the funds were not estate assets. *Jaric v. Jaric*, 2002-Ohio-5016 (7th Dist.).

{¶61} Matthew and Vincent argue the specific provisions of the power of attorney provide the power of attorney extends after Guito's death. It does not. The power of attorney states as follows: "the death of the Principal shall not revoke the power of attorney and authority of the Agent who, without actual knowledge of the death of the Principal, acts in good faith under the Power of Attorney. Any action so taken, unless otherwise invalid or unenforceable, shall insure to the benefit of and bind the Principal and the Principal's heirs, devisees and personal representatives." The undisputed testimony is that Miner learned of Guito's death on the day he died - December 18, 2018. Accordingly, Miner did not take any actions "without actual knowledge of the death" of Guito. As such, the above-noted power of attorney provision extending Miner's power and authority thereunder is inapplicable. The evidence at the hearing establishes that the power of attorney was no longer in effect when Miner transferred funds in 2019.

{¶62} Miner transferred the funds in 2019, without the use of the power of attorney or her letters of authority as executrix. This is because Guito's opening of the account in joint and survivorship form, in the absence of fraud, duress, undue influence, or lack of mental capacity, is conclusive evidence of his intent to transfer Miner the balance remaining in the account at his death. *Wright v. Bloom*, 69 Ohio St.3d 596, 596 (1994). Likewise, the "survivorship rights under a joint and survivorship account of the co-party or co-parties to the sums remaining on deposit at the death of the depositor may not be defeated by extrinsic evidence that the decedent did not intent to create in such surviving party or parties a present interest in the account during the decedent's lifetime." *Id.* Here,

there is no evidence of fraud, undue influence, or lack of mental capacity of Guito in November of 2013, when he added Miner to the account in a joint and survivorship capacity. "The creation of a joint and survivorship account is a contractual arrangement between the bank and the depositors." *Wiehe v. JPMorgan Chase Bank, N.A.*, 2025-Ohio-3308, ¶ 42 (5th Dist.). Upon Guito's death, the Joint Checking Account became Miner's property, a non-probate asset, pursuant to the contractual arrangement Guito had with the bank. *Wright*, 69 Ohio St.3d at 596 (joint and survivorship presumption "serves to establish the surviving party's right to the sums remaining on deposit at the depositor's death as against the estate of the depositor").

*Manifest Weight of the Evidence*

{¶63} Miner contends that, even if Matthew and Vincent did not abandon their claim, the trial court's finding that Miner's act of placing the proceeds from the home sale in the Joint Checking Account violated R.C. 1337.34 and R.C. 1337.42 is against the manifest weight of the evidence. We agree.

{¶64} In *Eastley v. Volkman*, 132 Ohio St.3d 328 (2012), the Supreme Court of Ohio clarified the standard of review appellate courts should employ when assessing the manifest weight of the evidence in a civil case, and held the standard of review for manifest weight of the evidence for criminal cases stated in *State v. Thompkins*, 78 Ohio St.3d 380 (1997), is also applicable in civil cases. A reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine "whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id.* at 387. "In a civil case, in which

the burden of persuasion is only by a preponderance of the evidence, rather than beyond a reasonable doubt, evidence must still exist on each element (sufficiency) and the evidence on each element must satisfy the burden of persuasion (weight)." *Eastley*, 132 Ohio St.3d at 334.

{¶65} Under well-established law, as an appellate court, we are not fact finders; we neither weigh the evidence nor judge the credibility of the witnesses. Further, "an appellate court should not substitute its judgment for that of the trial court when there exists … competent and credible evidence supporting the findings of fact and conclusions of law." *Seasons Coal v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶66} The trial court found that Miner's transfer of the funds from the sale of Guito's home into the Joint Checking Account violated R.C. 1337.34(A)(1), R.C. 1337.34(A)(3), and R.C. 1337.42(B).

{¶67} We first note that the trial court's decision is against the manifest weight of the evidence due to the testimony of both Matthew and Vincent. As detailed above, Matthew testified that, when Miner deposited the funds into the Joint Checking Account, Miner did not breach her fiduciary duties to Guito, and the only breach he (Matthew) is alleging is the alleged breach that occurred when Miner took the money from the Joint Checking Account after Guito's death and placed it into her personal account. Similarly, Vincent testified that he was not going forward with any allegations of misconduct by Miner other than the movement of the funds out of the Joint Checking Account into her personal savings account.

{¶68} The trial court found Miner failed to "act in accordance with the principal's reasonable expectations to the extent actually known by the agent and, otherwise, in the

principal's best interest" because Guito's will demonstrates Guito intended to leave Miner $100,000, "as well as the remainder of the relatively small sum that would have been left in his bank account." However, there was no evidence presented at the December 2023 hearing that Guito intended to leave Miner only "a relatively small sum that would have been left in his bank account."

{¶69} The signature card on the Joint Checking Account establishes Guito's conclusive intent to transfer the entire balance of the account to Miner upon his death. The power of attorney specifically permitted Miner to sell the house and place the proceeds into a joint account. Miner testified to the pattern she established with Guito over twenty years ago that she would use the funds in the Joint Checking Account to pay for his monthly bills and expenses. Miner testified that Guito wanted and needed to be taken care of prior to leaving anything to anyone in the will, and Guito understood that his funds would go to pay his expenses, such as the nursing home, prior to any funds being left pursuant to his will.

{¶70} Additionally, upon selling the home, Miner stopped taking money out of the Annuity Account to pay for Guito's monthly expenses. The money from the Annuity Account ultimately ended up in Guito's estate, thus preserving his estate plan and reasonable expectations.

{¶71} Likewise, there was no evidence adduced at the hearing that Miner was not acting in Guito's best interest when she sold the home and placed the funds into the Joint Checking Account. Further, to the extent that Miner had to rebut any presumption of undue influence or fraud with evidence of fairness of the transaction, the undisputed testimony of Miner also demonstrated the fairness of the transaction. She asked both

Matthew and Vincent if they wanted the home before she sold it; they declined. She sold the home because she could no longer insure the home due to it being vacant, and because the house was falling into disrepair - needing to be fixed. Additionally, Miner stated that Matthew took care of the home's lawn but no longer wanted to do so. Miner's undisputed testimony (which the trial court specifically found credible) was that she was using the money in the Joint Checking Account for Guito's care and was preserving the funds she had been using from the Annuity Account for his estate. Miner's undisputed testimony was also that the Joint Checking Account was the only account she ever utilized in the over twenty years she helped Guito with his finances.

{¶72} The trial court's judgment entry indicates that, had Guito lived longer and depleted the funds from the sale of the home, Miner would not have violated R.C. 1337.34(A)(1). Perhaps if there was some evidence at the hearing that Miner sold the home and placed the proceeds into the Joint Checking Account knowing that Guito's death was imminent, there may be competent and credible evidence to support the trial court's decision. However, at the hearing there was no evidence presented of Guito's imminent demise. Neither Matthew nor Vincent had seen their father in the months before his death. Miner testified that, while Guito had dementia and had good days and bad days, he recognized her the day before he died, and she heard nothing from the staff at the nursing facility to make her think that Guito's death was imminent. Certainly, there was no such evidence at the time of the home sale in 2018. Miner anticipated that Guito would continue to need long-term care for dementia.

{¶73} Accordingly, the trial court's finding that Miner violated R.C. 1337.34(A)(1) by placing the funds from the sale of Guito's home into the Joint Checking Account is not supported by competent and credible evidence.

{¶74} The trial court also found Miner violated R.C. 1337.34(A)(3) and R.C. 1337.42(B) because Miner acted outside the scope of the power of attorney by "gifting" herself the funds from the proceeds of the house.

{¶75} "A power of attorney is a written instrument authorizing an agent to perform specific acts on behalf of his principal." *Testa v. Roberts*, 44 Ohio App.3d 161, 164 (6th Dist. 1998). The power of attorney executed by Guito specifically permitted Miner to "sell … any property whatsoever, real or personal … upon such terms considerations and conditions" as Miner thought proper. It also specifically permitted Miner to "deposit and withdraw … in either my said Agent's name or my name, or jointly in both our names, in or from any banking institution, any funds, negotiable paper or moneys which may come into my said Agent's hands as such Agent, or which I now or hereafter may have on deposit or be entitled to."

{¶76} The trial court found that, despite Miner's credible testimony that she did not know that funds in the Joint Checking Account would go to her upon Guito's death, Miner violated R.C. 1337.34(A)(3) and R.C. 1337.42(B) because, despite any good faith belief held by Miner, she "gifted" herself the funds from the home by placing the funds into the Joint Checking Account. However, there was no competent and credible evidence at the hearing to support the trial court's finding that Miner's placement of the funds into the Joint Checking Account was a "gift" to herself. Miner's intent, which was readily evident, was to use the funds for Guito's continued care.

{¶77} Miner testified she asked both Matthew and Vincent if they wanted the house; they both declined. Matthew confirmed that Miner asked him if he wanted the house and he declined. Both Matthew and Vincent testified that, at the time the home was sold, Guito needed full-time nursing care due to his dementia. Miner testified that she did not know the funds in the Joint Checking Account would go to her upon Guito's death. Additionally, Miner's undisputed testimony is that the funds from the sale of the home were being used to pay Guito's monthly expenses. The trial court specifically found this testimony credible; thus, Miner lacked the donative intent required for a gift at the time she placed the funds from the sale of the home into the Joint Checking Account. *Wood v. Wade*, 1986 Ohio App. LEXIS 6401, at * 4 (5th Dist. April 14, 1986) (donative intent required for gift).

{¶78} Because there is not competent and credible evidence to support the trial court's determination that Miner's transfer of the funds into the Joint Checking Account was a gift, Miner did not act outside the scope of the authority given to her by the power of attorney, and did not exercise authority under the power of attorney to create an interest in Guito's property via a gift to herself. The trial court's finding that Miner violated R.C. 1337.34(A)(3) and R.C. 1337.42(B) is against the manifest weight of the evidence.

{¶79} Upon our review, Miner's first assignment of error is sustained. The trial court abused its discretion in finding Miner violated the Uniform Power of Attorney Act when she transferred the funds from the home sale into the Joint Checking Account because Matthew and Vincent abandoned this claim at the hearing. Alternatively, we find there was not competent and credible evidence presented at the hearing that Miner violated the Uniform Power of Attorney Act by placing the funds from the home sale into

the Joint Checking Account. We find the disputed funds ($207,487.90) are non-probate assets that passed to Miner pursuant to the contract Guito established with the bank when he added Miner to the account in 2013 in a joint and survivor capacity. Accordingly, these funds were not required to be included in the final account in Guito's estate.

*Matthew and Vincent's Assignment of Error I.*

{¶80} In their first assignment of error, Matthew and Vincent contend the trial court violated the law-of-the-case doctrine because the trial court failed to answer the four questions Matthew and Vincent allege this Court ordered [in *Alibrando I*] the trial court to answer in "deciding whether to implement R.C. 2109.50." We disagree.

{¶81} The law-of-the-case doctrine provides, "the decision of the reviewing court in a case remains the law of the case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels." *Nolan v. Nolan*, 11 Ohio St.3d 1, *3 (1984). "The doctrine is considered to be a rule of practice rather than a binding rule of substantive law and will not be applied so as to achieve unjust results." *Id.* at *4; *R.G. v. N.G.*, 2022-Ohio-1886, ¶ 13 (5th Dist.). Whether the trial court properly applied the law-of-the-case doctrine presents a question of law to which a de novo standard of review applies. *Giancola v. Azem*, 2018-Ohio-1694.

{¶82} "The doctrine of the law of the case comes into play only with respect to issues previously determined." *Quern v. Jordan*, 440 U.S. 332 (1979). In the first appeal, we did not "conclusively determine" that Miner had a fiduciary duty pursuant to the power of attorney after Guito's death, that Miner violated any fiduciary duty she had before Guito's death, that Miner violated any duty contained in R.C. Chapter 1337, or that she concealed assets. Rather, we held that the trial court committed error in granting

summary judgment because genuine issues of material fact [then] existed as to Matthew and Vincent's claims against Miner, and we found the trial court judge failed to properly analyze all the issues before rendering summary judgment. We merely listed example questions demonstrating the existence of genuine issues of material fact. However, there was no "mandate" that the trial court answer these questions and no conclusive determination with respect to the legal issues in the case. Accordingly, the law of the case doctrine is not applicable. *Giancola v. Azem*, 2018-Ohio-1694.

{¶83} Additionally, it would have been illogical for this Court to have ordered the trial court to answer only four questions upon remand because we specifically found that Matthew and Vincent should have been permitted to amend their complaint to add a claim for constructive trust ("the trial court erred in denying appellants' motion to amend their complaint"). *Alibrando I*. When Matthew and Vincent filed their amended complaint, the amended complaint superseded the original complaint. *Mercer v. Keane*, 2021-Ohio-1576, ¶ 38 (5th Dist.). Upon remand, the parties conducted additional discovery on the amended complaint without objection from either Miner, Matthew, or Vincent. After this extensive discovery, the trial court conducted a hearing/trial, and issued findings of fact and conclusions of law that did not violate this Court's previous opinion in *Alibrando I.*

{¶84} Upon our de novo review, we find the trial court did not violate the law-of-the-case doctrine. Matthew and Vincent's first assignment of error is overruled.

*Matthew and Vincent's Assignments of Error II., III., IV., and V.*

{¶85} In Matthew and Vincent's second, third, fourth, and fifth assignments of error, they contend the trial court erred in finding Miner not guilty of concealment, and in

failing to implement the provisions of the Ohio Revised Code relating to concealment (R.C. 2109.50, R.C. 2109.52, R.C. 2109.53, and R.C. 2109.54).

{¶86} Matthew and Vincent contend the trial court improperly held that they were required to demonstrate fraud and/or undue influence in order to find Miner guilty of concealment. Further, that, upon finding the proceeds from the sale of the real property belonged to Guito's estate, the trial court had a "mandatory duty" to apply R.C. 2109.50.

{¶87} As detailed above, we find the trial court committed error in finding the proceeds from the sale of the real property belonged to Guito's estate. Rather, the proceeds from the sale of the home became Miner's upon Guito's death because they were in a joint and survivorship account. Pursuant to R.C. 2109.50, in order to find a person guilty of concealment, the money or property allegedly concealed or conveyed away must be property of the estate. The Supreme Court of Ohio has determined that an interested person states an actionable cause of action under R.C. 2109.50 with a two-prong test: (1) the asset is the exclusive property of the estate and (2) the defendant has unauthorized possession of the asset or in some way has impermissibly disposed of it. *Goldberg v. Maloney*, 2006-Ohio-5485, ¶ 35. Because the funds at issue were not property of the estate, the first prong of the inquiry is not met, and Matthew and Vincent do not state a viable cause of action under R.C. 2109.50.

{¶88} Further, the trial court properly cited the concealment law. The trial court did not require evidence of fraud and/or undue influence for a finding of concealment, as previously prohibited by this Court in *Gustafson v. Miller*, 2015-Ohio-5515 (5th Dist.). The trial court correctly found that while Matthew and Vincent did not have to demonstrate any fraud or undue influence, they did have to establish "wrongful conduct," by a

preponderance of the evidence. *In re Estate of Harmon*, 2016-Ohio-2617 (5th Dist.); *Goldberg*, 2006-Ohio-5486 at ¶ 36. Because of the quasi-criminal nature of the concealment statute, "wrongful or culpable conduct on the part of the person accused is an element of the offense, which must be proven by a preponderance of the evidence." *Estate of DeChellis v. DeChellis*, 2019-Ohio-3078, ¶ 25 (5th Dist.). Thus, a complainant must prove more than "mere possession" of the estate assets. *Id.*

{¶89} We find there is competent and credible evidence to support the trial court's finding that Matthew and Vincent did not show, by a preponderance of the evidence, that Miner acted "wrongfully." The trial court found Miner's testimony credible that she did not know the funds in the Joint Checking Account would be hers upon Guito's death. Matthew and Vincent did not provide any evidence to dispute Miner's testimony.

{¶90} Matthew and Vincent based their concealment claim on three different actions by Miner: (1) Miner violated the Uniform Power of Attorney Act when she utilized the power of attorney to sell Guito's home; (2) Miner violated the Uniform Power of Attorney Act when she deposited the proceeds from the sale of Guito's home into the Joint Checking Account; and (3) Miner violated the power of attorney when she transferred the funds from the Joint Checking Account to her personal account after Guito's death. As detailed above, Matthew and Vincent abandoned their claims to (1) and (2) at the hearing. Alternatively, the trial court's finding that Miner violated the Uniform Power of Attorney Act by placing the proceeds from the home sale into the Joint Checking Account is not supported by competent and credible evidence. Thus, neither actions (1) nor (2) can form the basis of any wrongful or culpable conduct by Miner – a prerequisite of liability for concealment. As to action (3), there is no dispute that the Joint Checking

Account was a survivorship account co-owned by Guito and Miner. We detailed above that, due to this joint and survivorship designation, the funds are not estate assets. R.C. 2109.50 limits concealment proceedings to cases in which a person is suspected of concealing funds "of such estate." *Jaric v. Jaric*, 2002-Ohio-5016 (7th Dist.). The funds passed to Miner upon Guito's death as a non-probate asset. Thus, action (3) likewise cannot form the basis of any wrongful or culpable conduct by Miner – a prerequisite of liability for concealment.

{¶91} Matthew and Vincent's second, third, fourth, and fifth assignments of error are overruled.

*Matthew and Vincent's Assignment of Error VI.*

{¶92} In Matthew and Vincent's sixth assignment of error, they contend the trial court erred in failing to order pre-judgment interest for the amount of monies withheld ($207,487.90).

{¶93} This assignment of error is predicated upon a finding that Miner is guilty of concealment and/or that a constructive trust should be imposed due to conversion. Because we affirm the trial court's finding that Miner was not guilty of concealment and affirm the trial court's decision not to impose a constructive trust – see below, we likewise overrule this assignment of error.

*Matthew and Vincent's Assignment of Error VII.*

{¶94} In their seventh assignment of error, Matthew and Vincent argue the trial court committed error in excluding the expert witness testimony of Michael Johrendt.

{¶95} A trial court has broad discretion in the admission or exclusion of evidence. *Huffman v. Pioneer Basement Water Proofing Co.*, 2008-Ohio-7032, ¶ 33 (5th Dist.). A

trial court has discretion to set a deadline by which the parties must disclose their expert witnesses, and to enforce its order by excluding all testimony from experts not disclosed by the deadline. *Paugh & Farmer, Inc. v. Menorah Home for Jewish Aged*, 15 Ohio St.3d 44, 45-46 (1984). An abuse of discretion connotes more than an error of judgment; it implies that the trial court's attitude was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶96} We find no abuse of discretion in the trial court's exclusion of Johrendt as an expert witness. Johrendt was disclosed after the deadline of August 15, 2023, and was not a rebuttal witness.

{¶97} Additionally, any exclusion of Johrendt's report was harmless error. At his deposition, Johrendt testified he sought to testify regarding whether Miner had a fiduciary duty to Matthew and Vincent and regarding reasonable attorney fees arising from a concealment violation. However, the existence of a duty is a question of law for the court to decide. *Mussivand v. David*, 45 Ohio St.3d 314, 318 (1989). Further, the trial court denied Matthew and Vincent's request for attorney fees based upon the not guilty finding on the concealment claim and the lack of bad faith by Miner. Thus, no substantial right of the parties was affected because the trial court would have reached the same decision had the error not occurred. Civil Rule 61.

{¶98} Matthew and Vincent's seventh assignment of error is overruled.

*Matthew and Vincent's Assignment of Error VIII.*

{¶99} In their eighth assignment of error, Matthew and Vincent contend the trial court erred in failing to award them reasonable attorney fees and costs, as Johrendt opined the legal services were reasonable and necessary.

{¶100} We review the probate court's award or lack of award of attorney fees for an abuse of discretion. *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143 (1991).

{¶101} Ohio has long adhered to the "American Rule" with respect to recovery of attorney fees:  a prevailing party in a civil action may not recover attorney fees as part of the costs of the litigation.  Exceptions to this rule include the existence of a statute or enforceable contract specifically providing for the recovery of attorney fees, or if the prevailing party can establish bad faith or malice on the part of the losing party.  *Fox v. City of Pataskala*, 2018-Ohio-1592, ¶ 32 (5th Dist.).  An award of attorney fees in a concealment action is proper upon a finding of guilty or a showing of bad faith.  R.C. 2109.52.  However, mere possession of an estate asset does not constitute concealment and is insufficient to award attorney fees.  *In re Estate of Schoeneman*, 2011-Ohio-5243, ¶ 19 (5th Dist.).

{¶102} In this case, because Miner is not guilty of concealment, there is no statute providing for the recovery of attorney fees.  Further, there is no showing that Miner acted in bad faith.  Finally, due to our decision on Miner's cross-appeal, Matthew and Vincent are not the prevailing parties.  Accordingly, the trial court did not abuse its discretion in denying Matthew and Vincent's request for attorney fees.

{¶103} Matthew and Vincent's eighth assignment of error is overruled.

*Matthew and Vincent's Assignment of Error IX.*

{¶104} In their ninth assignment of error, Matthew and Vincent argue the trial court committed error in not finding Miner violated her fiduciary duty and/or the Uniform Power of Attorney Act when she transferred the funds from the Joint Checking Account to her personal account after Guito's death.  Matthew and Vincent contend when Miner made

this transfer, her actions were not in good faith, she failed to act in accordance with Guito's reasonable expectations, and Miner failed to attempt to preserve Guito's estate plan.

{¶105} As analyzed above, the power of attorney terminated on December 18, 2018, as Miner found out about Guito's death that day. Because the power of attorney terminated, Miner cannot be held liable for violating the Uniform Power of Attorney Act two months after Guito's death, and she had no fiduciary duty based on that terminated power of attorney. There is no dispute that the Joint Checking Account was a joint and survivorship account. Upon his death, the funds in the account became the sole property of Miner, and they are not estate assets.

{¶106} Miner did not transfer the funds in her capacity as executrix of the estate, because funds in a joint and survivorship accounts are not probate assets. At the point Miner transferred the funds, she was simply transferring her funds located in one bank account to another bank account in her name.

{¶107} Matthew and Vincent's ninth assignment of error is overruled.

*Matthew and Vincent's Assignment of Error X.*

{¶108} Matthew and Vincent's tenth assignment of error is duplicative of their sixth and eighth assignments of error – that the trial court committed error in not awarding prejudgment interest, attorney fees, and costs, to Matthew and Vincent.

{¶109} For the reasons stated in assignments of error six and eight, Matthew and Vincent's tenth assignment of error is overruled.

*Matthew and Vincent's Assignment of Error XI.*

{¶110} In Matthew and Vincent's final assignment of error, they argue the trial court committed error by failing to remove Miner as executrix of the estate pursuant to R.C.

2113.18. They also argue the trial court committed error in failing to place a constructive trust on the disputed funds ($207,487.90) because the "abuse of trust" by Miner as Guito's fiduciary when utilizing his power of attorney creates an equitable remedy. We disagree.

*Removal of Executor*

{¶111} R.C. 2113.18(A) provides, "the probate court may remove any executor or administrator if there are unsettled claims existing between the executor or administrator and the estate that the court thinks may be the subject of controversy or litigation between the executor or administrator and the estate or persons interested in the estate." "Removal of the executor under R.C. 2113.18 is clearly discretionary with the trial court." *In re Estate of McCauley*, 2014-Ohio-2291, ¶ 11 (5th Dist.). Abuse of discretion is more than an error of law or judgment; it implies the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶112} We find no abuse of discretion in the trial court's denial of the motion to remove executor. The parties disagreed on the handling of one asset or sum of money, the proceeds from the sale of Guito's house. There was no conflict in the handling of the remainder of Guito's estate. *In re Estate of McCauley*, 2014-Ohio-2291 (5th Dist.). Importantly, though the trial court did not remove Miner as the executrix of Guito's estate, the trial court ordered all assets of Guito's estate, including the disputed funds at issue ($207,487.90), be placed into the IOLTA account of Miner's attorney during the pendency of this case. When asked at the hearing what he felt the court should do about "who's going to be the executor to finish up [Guito's] estate," Matthew testified, "I don't know." We additionally note that, pursuant to both Miner's testimony and the final account filed in Guito's estate, she did not take any fiduciary fees as executrix of Guito's estate.

*Constructive Trust*

{¶113} A constructive trust is an equitable remedy that protects against unjust enrichment and is usually invoked when property has been obtained by fraud. *Estate of Cowling v. Estate of Cowling*, 2006-Ohio-2418. However, "a constructive trust may also be imposed where it is against the principles of equity that the property be retained by a certain person even though the property was acquired without fraud." *Ferguson v. Owens*, 9 Ohio St.3d 223, 226 (1984). The party seeking to have a constructive trust imposed bears the burden of proof by clear and convincing evidence. *Cowling*, 2006-Ohio-2418 at ¶ 20. Accordingly, the question is whether Matthew and Vincent presented clear and convincing evidence of an inequitable situation or that unjust enrichment would result if Miner retained the disputed funds.

{¶114} Matthew and Vincent based their constructive trust claims on the same three factual allegations as their concealment claim: (1) Miner's actions of selling Guito's house violated the Uniform Power of Attorney Act; (2) Miner's action of placing the funds from the sale of the home into the Joint Checking Account violated the Uniform Power of Attorney Act; and (3) Miner's actions in 2019 of transferring the funds from the Joint Checking Account to her personal account violated the Uniform Power of Attorney Act. The trial court did not impose a constructive trust pursuant to any of these factual allegations.

{¶115} We find no error in the trial court's determination. As analyzed above, Matthew and Vincent abandoned their claim that Miner's action of selling Guito's home violated the Uniform Power of Attorney Act. Further, the power of attorney specifically provided Miner with the power to sell Guito's real estate. Matthew and Vincent

additionally abandoned at the hearing their claim that Miner's action of placing the funds from the sale of the home into the Joint Checking Account violated the Uniform Power of Attorney Act. Alternatively, any finding that Miner violated the Uniform Power of Attorney Act by placing the home sale proceeds into the Joint Checking Account is against the manifest weight of the evidence. Finally, Miner's transfer in 2019 was not pursuant to the power of attorney because the power of attorney was terminated upon Guito's death in December of 2018. Likewise, the transfer was not made pursuant to her position as executrix of Guito's estate. Thus, Miner had no fiduciary duty to Guito with regards to the disputed funds. Her transfer of the funds from herself to herself in 2019 did not violate any duty to Guito. No unjust enrichment or inequitable situation results from Miner's keeping the disputed funds. This is because the funds contained in the Joint Checking Account were properly distributed to Miner pursuant to the contract Gutio created with the bank when he made the account a joint and survivorship account in 2013.

{¶116} Accordingly, the trial court did not commit error in failing to impose a constructive trust on the disputed funds. Matthew and Vincent's eleventh assignment of error is overruled.

*Conclusion*

{¶117} Based on the foregoing, Miner's assignment of error is sustained. The trial court committed error in finding Miner's action of placing the funds from the home sale into the Joint Checking Account in July of 2018 violated Miner's fiduciary duty as imposed by the Uniform Power of Attorney Act because the claims were abandoned at the hearing and/or the finding of violations of the Uniform Power of Attorney Act was against the manifest weight of the evidence.

{¶118} Matthew and Vincent's assignments of error are overruled.  We find the disputed funds ($207,487.90) are non-probate assets that properly passed to Miner pursuant to the contract Guito established with the bank when he added Miner to the account in 2013 in a joint and survivor capacity.  Accordingly, these funds were not required to be included in the final account in Guito's estate.

For the reasons stated in our Opinion, the judgment of the Licking County Court of Common Pleas, Probate Division, is affirmed in part and reversed and remanded in part for proceedings consistent with this opinion.

Costs to Appellants/cross-Appellees, Matthew and Vincent Alibrando,

By: Popham, J.

King, P.J. and

Montgomery, J., concur